**ANTONIO WILLIAMS, Plaintiff**
**v.**
**JOSEPH RENE AND ESSO VIRGIN ISLANDS, INC.,**
**Defendants/Third Party Plaintiffs**
**v.**
**SCOTT DRAKE and JOHN DOE, Third Party Defendants**

Civil No. 1991/231

District Court of the Virgin Islands

Div. of St. Croix

March 27,1995

218

Lee J. Rohn, Esq., Christiansted, St. Croix, V.I. and Renee D. Dowling, Christiansted, St. Croix, V.I., *for plaintiff*

Douglas L. Capdeville, Christiansted, St. Croix, V.I., *for defendant Esso*

Warren B. Cole, Christiansted, St. Croix, V.I., *for defendants Esso and Rene*

FINCH, *U.S. District Judge*

### MEMORANDUM OPINION

Before the Court is defendant Esso's Motion for a New Trial, Judgment as a Matter of Law, or, in the Alternative, Remittitur.

Plaintiff has filed a response to this motion and defendant has filed a reply to that response. Both parties filed supplemental memoranda with the Court following the completion of the trial transcript. On January 26, 1995, the Court heard oral argument on the motion. A week after argument, the defendant sent a six-page letter to the Court elaborating on its oral arguments and enclosing an voluminous "appendix" of case law on the subject of remittitur. On plaintiff's motion, the Court entered an order to strike these additional materials since they were filed contrary to the law of this jurisdiction. Attorneys Lee J. Rohn, and Renee D. Dowling represented the plaintiff at trial and during these post-trial motions. Attorney Warren B. Cole represented both defendants—Joseph Rene ("Mr. Rene") and Esso Virgin Islands, Inc. ("Esso") at trial. On October 5, 1994, after the trial had been completed, Attorney Douglas L. Capdeville filed an appearance in the case on behalf of Esso only and as co-counsel to Mr. Cole. For the reasons stated below, defendant's motion is denied.

## Factual and Procedural Background

On December 12, 1990, an automobile accident occurred involving a car driven by Mr Rene, an employee of Esso, and plaintiff, Mr. Antonio Williams ("Mr. Williams"). The car that Mr. Rene was driving at the time of the accident was owned by Esso. On August 12, 1991, plaintiff filed a complaint asserting negligence on the part of both Mr. Rene and Esso and requesting damages. On September 19, 1994, the case went to trial before a jury. In his case in chief, plaintiff alleged that due to the accident he sustained severe injury to his back, suffered excruciating pain, and ultimately became permanently disabled. Plaintiff's medical experts diagnosed his injuries as including two bulging discs, one of which may be herniated, and pressure on his spinal nerves causing nerve damage and pain in his legs. Plaintiff further alleged that the pain caused by his back injury forced him to cease many recreational activities, resulted in anxiety about his ability to care for and support his ten (10) children, and caused difficulties in sexual relations. Evidence was also produced that plaintiff is reliant upon pain medication and that he suffers from severe depression and has considered suicide.

During the trial plaintiff presented twenty witnesses. Among these were expert witnesses including a doctor specializing in neurology and internal medicine, a doctor specializing in physical medicine and rehabilitation, a psychiatrist, a psychologist specializing in vocational rehabilitation and pain management, and an economist. In addition, the plaintiff himself testified, as well as many fact witnesses who testified about the accident, Mr. Williams' current mental and physical condition and Esso's practices regarding the use of company cars.

During defendants'[1] opening statement and case in chief, defendants' attorney asserted that neither Mr. Rene, nor Esso was responsible for the accident. He urged that some other force (either the plaintiff's own negligence or a stalled vehicle on the road) was to blame for the accident, and argued that Mr. Rene was not in the course and scope of his employment at the time of the accident. Defendants' attorney also suggested that plaintiff had serious pre-existing injuries to his back and that he had not been wearing a seat-belt when the accident occurred. Unfortunately for the defendants, they were not able to persuade the jury of any of these assertions at trial.

Defendants presented six witnesses during trial. These included one expert who specialized in the design of the type of car the plaintiff had been driving at the time of the accident. Defendants also presented fact witnesses including the Director of Human Resources at the Virgin Islands Water and Power Authority ("WAPA") where Mr. Williams was employed, Mr. Rene, and two witnesses who testified about an abandoned vehicle which had been sighted several hours before the accident at or near the scene of the accident. The sixth defense witness, as will be discussed in greater detail below, was one of plaintiff's expert witnesses whom the defendants recalled and questioned briefly during their case in chief.

---

[1] At the close of all evidence, the Court granted the plaintiff's motion to dismiss the case against Mr. Rene, leaving Esso as the only defendant in the case. As a result, the post-trial motions which are the subject of this memorandum are brought solely by defendant Esso. Where the Court uses the word defendants (plural), it is intended to refer to the actions of Esso and Mr. Rene at a point in the proceedings before Mr. Rene was dismissed.

Immediately before, and during, the trial, both parties filed various and numerous motions with the Court including motions for summary judgment, motions in limine to restrict and bar testimony by various experts and lay people, motions for directed verdict and a motion for a mistrial (filed by defendant.) After seven days of trial, plaintiff moved to dismiss its case against Mr. Rene, and then the jury was charged and returned a verdict for the plaintiff in the amount of $4,500,000 (four million, five hundred thousand dollars.) The motion that is the subject of this opinion was then filed. On January 26, 1995 the Court heard oral argument on the motion. At this hearing, both plaintiff and defendant spoke only to the issues of respondeat superior and remittitur (issues II and IX in the discussion that follows) and relied on their prior submissions for their other arguments.

## Discussion

### I. Conduct and Preparation of the Defense

Before addressing the specific legal issues raised in the defendant's motion, the Court is compelled to comment on the conduct of the defense attorney during trial. Most importantly, the Court is dismayed—but obligated—to note the lack of consideration the defendants' legal team has given to the representation needs of Mr. Rene during this case. At trial, one attorney, Mr. Cole, represented both Esso and its employee, Mr. Rene. Despite his obligation to represent both of his clients loyally and zealously, this attorney has pursued a strategy in which the representation of Mr. Rene appears to have been sacrificed for the representation of Esso.[2] While the question of the ethical conduct of the attorneys for the defense in

---

[2] As was stated above, Mr. Capdeville filed an appearance on behalf of Esso after the trial had been completed at which time Mr. Rene had been dismissed from the case. Because Mr. Capdeville is apparently representing only Esso, and has no lawyer-client relationship with Mr. Rene, the comments of the Court here apply only to Mr. Cole. Nevertheless, the Court is concerned that as co-counsel to Mr. Cole, Mr. Capdeville (and thus Esso) may have obtained the benefit of Mr. Cole's confidential relationship with Mr. Rene. The Court is also concerned that in-house corporate counsel for Esso working with Mr. Cole and Mr. Capdeville may also have benefitted from information received confidentially from Mr. Rene.

this matter has not been formally challenged by either party,[3] the Court is distressed by what appears to be undue attention given to the defense of Esso at the expense of Mr. Rene.[4]

At oral argument, on January 26, 1995, current counsel for Esso, Mr. Capdeville, assured the Court that if a new trial were to be granted, Mr. Rene would have separate counsel. That is all very well, but it is also all very late. It does nothing to change the fact that Mr. Rene may have received less than the representation he deserved at trial. Nor does it change the fact that Esso's counsel may have benefited from confidential communications with Mr. Rene as well as from the opportunity to prepare him for trial. Finally, Mr. Capdeville's assurance does nothing to change the fact that in filing the instant motion for a new trial, Mr. Cole appears to have pursued a strategy in direct conflict with the interests of his client, Mr. Rene. Just before closing arguments, Mr. Rene was dismissed as a defendant on the motion of *plaintiff's* attorney and the jury returned a verdict to be paid entirely by Esso. If the story had ended at this point, it would seem that little or no damage had been done to Mr. Rene by the questionable representation arrangement. Now, however, Esso is seeking a new trial and in the process Esso's lawyers—including Mr. Cole—are energetically pursuing a strategy that could potentially re-expose Mr. Rene to liability for an extremely high damage award. In its post-trial motions, defendant Esso has pursued a strategy of attempting to disprove its own liability while characterizing Mr. Rene as a violator of Esso policy regarding the use of company vehicles.[5] This course of events has done nothing to convince the Court that a new trial should be

---

[3]The issue of Mr. Cole's ethical conduct was mentioned for the first time in these proceedings by the plaintiff in his December 12, 1994 Response to Defendant Esso's Supplemental Memorandum in Support of Motion for New Trial or in Alternative, Remittitur. Even in that submission to the Court, plaintiff merely highlights the problem without requesting that the Court take any specific action.

[4]The Court can imagine only one scenario in which the conflict of interest issues discussed here could be considered harmless. If, within ten days of the filing of this opinion, defendant Esso provides to the Court evidence that prior to trial it indemnified Mr. Rene, in writing, for any damages for which he may become responsible, the Court will modify this opinion accordingly.

[5]The filings submitted to the Court on the issue of defendant's post-trial motions have been signed by both Mr. Cole and Mr. Capdeville, or (in one case) by Mr. Capdeville and Mr. Cole's law partner, Mr. Hunter.

granted—but it has done a great deal to call into question the conduct of the attorneys representing Esso.[6]

Apart from ethical concerns, the Court has also been deeply troubled by the fact that the defendants have apparently waited until the post-trial motions to actually try their case. In numerous ways, the actions of the defendants' counsel have led to a situation in which the jury had the evidence upon which to grant an enormous damage award—and the Court has no real choice but to deny the defendant's post-trial motion. Again and again, the defendants were confronted with overwhelming evidence against them from plaintiff—and again and again, defendants did not counter that evidence with evidence of their own. The Court got the impression that the attorney for the defendants was simply not prepared to try the case, yet despite this, the defense attorney made no effort to postpone the trial.

It now appears to the Court that defendant Esso was merely treating the trial as some sort of dress rehearsal for post-trial motions and perhaps appeal.Only now that Esso is faced with such a huge jury award, is it ready to mount the defense it should have presented at trial. While the Court has given very serious consideration to each of the grounds upon which defendant has moved for a new trial, the Court has not been swayed by the attempts of defendant Esso's counsel to re-write the history of the trial by misrepresenting the trial record. If there existed appropriate grounds on which to order a new trial or remittitur, the Court would do so. Such grounds do not exist, however, and the reason is simple: the plaintiff proved his damages at trial; the evidence of plaintiff's injuries and losses is overwhelming and, in most instances, utterly unrefuted. There is no question in the Court's mind that the defense could have done a great deal more to counter the mass of evidence presented. Nevertheless, the defense did little and the jury was left with only plaintiff's mass of evidence. The actions of defense counsel have led to the result of a very large jury

---

[6] As has already been stated, the Court will deny the instant motion for a new trial on all grounds. Despite this, the Court is aware that it is possible, perhaps probable, that defendant will appeal this order. With this possibility in mind, the Court is compelled to raise the issue of Mr. Rene's representation. Should this case be remanded for a new trial, the Court will be required to decide how the conflict of interest issues involved here should be resolved.

verdict based on essentially unrefuted, competent evidence which supports the award, enormous though it is.

## II: The defendant moves for a new trial under Federal Rule of Civil Procedure 59(a) on the issue of whether Mr. Rene was acting in the course and scope of employment at the time of the accident.

This issue constitutes the main thrust of defendant's initial motion, its reply brief, and much of its oral argument. Defendant's arguments fall into two categories: 1) that the presumption created by the fact that Mr. Rene was an Esso employee driving an Esso vehicle was rebutted by inferences which may be drawn from evidence evoked at trial; and 2) that under the applicable law of agency, there was no showing that Rene was in the course and scope of his employment. For these reasons, Esso argues that the Court erred in refusing to submit the issue to the jury.

### A. *Rule 59—Motion for a New Trial*

■ Almost every objection raised by the defendant in its motion is set forth as grounds for a new trial and thus some discussion of the rule is warranted. FED. R. CIV. P. 59 "gives the trial judge ample power to prevent what he considers to be a miscarriage of justice. It is his right and indeed his duty, to order a new trial if he deems it in the interest of justice to do so." 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2801 (1973) AT 31 (Footnotes omitted.) The rule was written to allow all the grounds for a new trial that had been available at common law.[7]

■ While, the grounds upon which a new trial may be granted are virtually limitless, there are clear constraints on a trial judge's discretion to order a new trial. In this circuit, the landmark case on the subject of a trial judge's discretion under FED. R. CIV. P. 59 *is Lind*

---

[7]Professors Wright and Miller write that the general grounds for a new trial are that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions. The absence of a listing of specific grounds should not obscure the governing principle.

11 WRIGHT AND MILLER § 2805 supra, at 37-38 (footnotes omitted).

*v. Schenley Industries, Inc.*, 278 F.2d 79 (3d Cir. 1960), *cert. denied* 364 U.S. 835, 5 L. Ed. 2d 60, 81 S. Ct. 58 (1960). In Lind the U.S. Court of Appeals for the Third Circuit struggled with the various issues involved in a motion for a new trial, reviewed the standards that had been applied in other jurisdictions, and set-forth the law for this circuit.[8] As later U.S. Court of Appeals for the Third Circuit cases have interpreted Lind, it has come to stand for the proposition that a trial judge's discretion to grant a motion for a new trial depends on the grounds asserted in the motion. In cases involving an injustice resulting from an action of the trial judge, the trial judge has broad discretion to order a new trial. *Silverii v. Kramer*, 314 F.2d 407, 413 (3d Cir. 1963); *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993). On the other hand, in cases where the claim is that the jury decision is against the weight of the evidence, the trial judge has the least discretion in ordering a new trial. *Williamson v. Conrail*, 926 F.2d 1344, 1352 (3d Cir. 1991); *Klein v. Hollings*, 992 F.2d at 1289-1290. Defendant's brief contains requests for a new trial

---

[8]What we have stated demonstrates that there is no consensus of opinion as to the exact standards to be used by a trial court in granting a new trial and that the criteria to be employed by an appellate tribunal charged with reviewing the trial judge's decision in this respect are equally indefinite. New trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trial ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence. In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. In the latter instances, (2), *supra*, the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgement of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime functions of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

278 F.2d at 90.

based on several different grounds falling into both of these categories.

B. *Respondeat Superior*

 Under the *Lind* scheme, this Court has broad discretion to grant a new trial if it finds that it's decision to grant a directed verdict on the issue of respondeat superior was made in error. The case law in this circuit establishes that in ruling on a motion for directed verdict under FED. R. CIV. P. 50, "the court must view the evidence in the light most favorable to the non-moving party and draw all favorable inferences in its favor." *Andrews v. Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A motion for directed verdict brought by the party with the burden of production (as here) requires a slightly different examination by the trial judge. In *Mihalchak v. American Dredging Co.*, 266 F.2d 875 (3d Cir. 1959) *cert. denied* 361 U.S. 901, 4 L. Ed. 2d 157, 80 S. Ct. 209 (1959) the U.S. Court of Appeals for the Third Circuit addressed exactly this issue:

> Yet though a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable.

*Id.* at 877 (footnotes omitted.)

Defendant has repeatedly asserted that Mr. Rene was not in the course and scope of his employment at the time of the accident. The Court denied defendants' summary judgment motion on this question prior to trial stating that it was possible that evidence yet to be presented might warrant submission of the issue to a jury.

227

However, at the close of all the evidence, the Court granted plaintiff's motion for directed verdict on this question and defendant now moves for a new trial on the basis that the Court's directed verdict was granted in error.

■ As will be discussed in greater detail below, despite defendant's assertions, there was insufficient evidence presented at trial supporting defendant's position to warrant submitting the question of respondeat superior to the jury. Defendant now attempts to twist the testimony of plaintiff's witnesses to serve its needs. Defendant's attempts seriously misrepresent the trial record. Under Virgin Islands law a presumption is created that an employee is in the course and scope of his employment when driving a vehicle owned by his or her employer. For the reasons that follow, that presumption—established by defendant's own Concessions in opening argument (Tr., vol. I at 86)—and by real and testimonial evidence—was never rebutted at trial. Artful efforts to recreate the trial record do not now save defendant from a directed verdict that was properly granted.[9]

■ A review of the law of respondeat superior and a review of the evidence presented at trial are both necessary to explicate the Court's ruling on this question. Both parties correctly identify *Pacheco v. United States*, 409 F.2d 1234 (3d Cir. 1969) as the key case in this jurisdiction on the question of course and scope of employment. *Pacheco* holds that once it is established that (1) the vehicle in question was owned by the defendant (Esso) and (2) was driven by an employee of the defendant (Mr. Rene) a presumption arises that the employee was in the course and scope of his employment. The *Pacheco* case states clearly that once the presumption has been established, it

> has continuing existence and the burden of establishing the non-existence of the presumed fact is on the [defendant]. This is expressly established by 5 V.I. Code § 812, based on Rule 14 of the Uniform Rules of Evidence, which prescribes that "(a) if

---

[9] The Court's decision on this question of whether a new trial is needed on the question of respondeat superior negates any need for discussion of defendant's second assertion (issue III, below): that Esso should have been granted judgment as a matter of law on this question.

the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the non-existence of the presumed fact is upon the party against whom the presumption operates."

*Id*. at 1238.

Defendant admits that such a presumption was established and that Esso has the burden of proof to rebut the presumption. Defendant argues, however, that the presumption was rebutted by evidence at trial. Specifically, defendant alleges in its brief that the evidence at trial showed:

1. The vehicle in question had not been assigned to or designated by Esso for the use of Mr. Rene. It had been designated for the use of the Esso Field Sales Representative, a position then occupied by Ms. Helen Sia.
2. Esso had not entrusted the vehicle to Mr. Rene. It had been "loaned" to Mr. Rene by Ms. Sia contrary to Esso policy.
3. Ms. Sia was not Mr. Rene's supervisor. Her act of 'loaning' the vehicle to Mr. Rene was not the act of a person with supervisory authority over Mr. Rene.
4. Ms. Sia had 'loaned' the vehicle to Mr. Rene solely for his personal convenience because his own vehicle was not working.
5. The accident occurred when Mr. Rene was en route from his home to Ms. Sia's house for the purpose of returning the vehicle to her.
6. Mr. Rene did not file a Workman's Compensation claim for this accident, despite having sustained serious injury.

Esso Memorandum of Law in Support of a New Trial, etc., at 2-3.

The problems with defendant's list of "evidence" are that: (1) it attempts to represent things that are simply not part of the trial record, (2) those facts actually presented by Esso at trial were either irrelevant or insufficient to rebut the presumption and (3) the defendant's list ignores the overwhelming evidence—which was presented at trial—tending to prove that Mr. Rene was in the course and scope of employment when the accident occurred.

229

■ In terms of defendant's specific assertions, the record shows the following: first, not one iota of evidence was presented by defendant at trial to prove that Mr. Rene's use of the company vehicle was prohibited by either company policy or company practice. Quite the contrary, the evidence suggests that his use of the car was authorized by Esso. Both Ms. Sia and Mr. Rene testified that neither of them were disciplined in the aftermath of the accident,[10] nor were either of them asked to pay for the damages to the vehicle. Moreover, Mr. Rene testified that he has continued, since the accident, to use company cars quite frequently with the knowledge of Esso. (Tr., vol. IV at 121-122.) It is true that defendant's counsel have repeatedly asserted that Mr. Rene's use of the car was contrary to company policy—but, as the Court instructed the jury, the assertions of counsel are not evidence. Second, while

---

[10] At oral argument on this motion, the Court requested that defendant identify at what point in the record it was established that Mr. Rene's use of the car was contrary to company policy. The defendants stated that it was established on pages 118-119 of volume I of the record. On those pages the following exchange occurs during counsel for the plaintiff's direct examination of Ms. Sia, an Esso employee:

Q: As a result of Mr. Rene having an accident in the vehicle that was assigned to the position that you were holding, was your right to operate a vehicle as a result of your position in any way revoked?
A: With the company?
Q: By the company, yes, ma'am.
A: No.
Q: And were you given any disciplinary action?
A: A letter. I was given what they call an inter-office memo.
Q: Now that inter-office memo, does that count toward any disciplinary action or is it just a memo?
A: I believe it is a memo.
Q: Were you asked to pay for the damages to the vehicle?
A: No.
Q: Before you got this written memo after the accident, were you ever aware that you were not authorized to give Mr. Rene the vehicle to go home?
A: No. My intent was not to violate any rule whatsoever.
Q: In fact, were you aware that there was any such rule at the time you gave him the vehicle?
A: I was not aware consciously, no.
Q: Thank you very much. To your knowledge, was Mr. Rene ever disciplined as a result of this accident?
A: To my knowledge, no.

Tr. at vol. I pp. 118-119. The defendant could cite no other evidence for the existence of such a company policy. No such evidence was presented at trial by either party—and no evidence whatsoever on the subject of this supposed policy was introduced by the defendant in its case. The above passage of testimony in plaintiff's case does not demonstrate the existence of such a policy. If anything, it tends to prove that such a policy did not exist.

it is uncontroverted that Ms. Sia's company car was not "entrusted" to Mr. Rene, it is also uncontroverted that employees such as Mr. Rene were regularly asked to use Ms. Sia's car (and other Esso vehicles) to give rides to Ms. Sia (and other Esso employees.) Several Esso employees testified that they believed that providing such transportation was part of their job and that they were required to do so when requested. (*See, e.g.* Tr., vol. I at 124-125, 127-128, 129-130, 130-132.) Third, it is not clear what relevance, if any, Ms. Sia's supervisory status over Mr. Rene bears on the question of whether or not he was in the course and scope of his employment at the time of the accident. Fourth, the evidence presented at trial did not suggest that Ms. Sia provided her car to Mr. Rene "solely" for his personal convenience. The evidence presented at trial suggested that the car was loaned to Mr. Rene for several reasons: 1) his own car was not working, 2) he needed a way to get to work the next day and 3) Ms. Sia wanted somebody to take her to a meeting at the airport on the following day. Fifth, while it is true that evidence showed that the accident occurred when Mr. Rene was en route to Ms. Sia's house, the evidence further shows that Mr. Rene was going there to pick up Ms. Sia so that he could take her to a meeting at the airport and then take himself to work, all for the benefit of Esso. Sixth, the relevance, if any, of Mr. Rene's failure to present a Workman's Compensation form for this accident has never been established by defendant.

The propositions outlined by defendants are either irrelevant or not established at trial by evidence or reasonable inference. As such, none of these contentions may be said to have rebutted the presumption established by the fact that Mr. Rene was an Esso employee driving and Esso-owned vehicle.[11] Quite to the contrary,

---

[11] The defendant's reply brief contains a second list of evidence supposedly presented at trial, such as:

1. Esso employees were not allowed to use the Esso vehicle assigned to Ms. Sia for personal business or to drive Ms. Sia from her home to either the airport or the Esso fuel terminal. The vehicle was an Esso vehicle and was made available for use by other Esso employees for Esso business during regular working hours. The only time it was used to transport Ms. Sia to and from the airport was between the Esso terminal and the airport during working hours.

2. Evidence was introduced that Ms. Sia loaned the vehicle to Mr. Rene solely for his personal convenience contrary to Esso policy. Carlos Encarnacion testified that the Esso vehicles were not made available to employees for their personal convenience, but only

the overwhelming evidence presented tended to show that the prevailing company practice was to approve the use of company vehicles to ferry employees to and from work when their cars were broken, (*see, e.g.,* Tr., vol. I at 109, 114, 124-125, 127, 131, 136) or to take Ms. Sia (or others) to the airport or elsewhere for various reasons. (*See, e.g.,* Tr., vol. I at 114-117, 127-128.)

■ Next, defendant attempts to characterize Mr. Rene's use of the company vehicle as falling within an exception to the course and scope presumption by stating that Mr. Rene was simply going to work and, therefore, should not be considered in the course of his employment. This argument also rings hollow. In *Charles v. Mitchell and HOVIC,* 21 V.I. 478 (D.C.V.I. 1985), a case relied on by defendants, this Court noted that

> [f]irst, when a servant is supplied a company vehicle in order to go to and from work, the mere fact that the employer supplies a vehicle does not establish that those who avail themselves to use of the vehicle are within the scope of employment, especially if the use is merely casual. Here the use of the vehicle was not only casual but in direct violation of an express company policy, a policy which Mitchell admits he was aware of.
>
> Second, when a master allows an employee to use an instrumentality such as an automobile, the master is liable "only when the instrumentality is being used by the servant for the purpose of advancing the employer's business or interests as distinguished from the private affairs of the servant." It is unrebutted that at the time of the alleged incident Mitchell was running a personal errand an not engaged in any activity to advance HOVIC's interest.

---

for company business. Ms. Sia was reprimanded by Esso for having loaned the vehicle to Mr. Rene. . . .

4. It is quite obvious that Ms. Sia loaned Mr. Rene the vehicle for his own personal convenience and not for the convenience of Esso.

The Court finds that none of the above-stated propositions were supported by evidence presented at trial nor were these propositions which the jury could have reasonably inferred from the evidence that was actually presented. In fact, the Court finds that these assertions seriously misrepresent the trial record.

232

*Id.* at 482-483 (citations omitted.) The overwhelming evidence in this case suggests that Mr. Rene was en route to work and performing a specific task for Esso, *i.e.* picking up Ms. Sia and driving her to the airport. There is no evidence that he was on a personal errand. Moreover, while it is true that Esso had not specifically entrusted a car to Mr. Rene for the purpose of going back and forth to work, several witnesses testified that they believed that Esso would allow the use of company cars—and had done so—for the purpose of coming to work when an employee's personal vehicle was broken. In fact, Ms. Sia testified that Mr. Rene had utilized a different company vehicle for exactly this purpose on at least two other occasions. (Tr., vol. I at 108-109.) Finally, there is simply no evidence that Mr. Rene was acting contrary to company policy.[12]

Defendant also cites an opinion from the Territorial Court of the Virgin Islands, *McFarlane v. Jones Masonry*, 25 V.I. 43 (Terr. Ct. 1990) as support for their argument that Mr. Rene falls into the exception established by the going and coming rule. That opinion stated:

> There is an exception to the general [going and coming] rule, however. If the employee's conduct is necessarily incidental to his employment and is actuated, at least in part, by a purpose to further the master's business, an inference could be drawn that the employee's conduct occurred within the scope of his employment.

*Id.* at 46-47 (citations omitted). In this case, Mr. Rene's conduct was clearly incidental to his employment since he was attempting to get to work despite his own car troubles and was assisting Ms. Sia in reaching her meeting at the airport.

After alleging that the Pacheco presumption was rebutted, defendant Esso then attempts to move quickly to the Restatement (2d) of Agency, §§ 228 and 229 where it apparently finds more support for its assertions. The problem is that defendant moves too quickly. The *Pacheco* court itself noted the Restatement, stating:

---

[12] Defendant also cites *Charles* repeatedly for the proposition that use by an employee of a company vehicle in violation of an express Company policy works to rebut the presumption. This aspect of *Charles* is irrelevant here because no such express Esso policy was ever shown at trial.

"the Restatement of Agency, Second, §§ 228, 233, establishes general rules defining an agent's scope of employment, *but they are not relevant to the specific problem before us*. What is involved here is the existence and effect of a so-called presumption, a subject which has raised unending controversy among scholars and commentators.

409 F.2d at 1236. (Emphasis added.) The fact is that *Pacheco* states that when a plaintiff has proven that the vehicle operated in the accident is owned by the defendant, and the driver of that vehicle is an employee of the defendant, then the fact that the employee is in the course and scope of his employment is *presumed* until such time as the defendant offers evidence sufficient to rebut the presumption.[13] In the instant case, no such evidence was offered at trial.

### III: Defendant argues that judgment as a matter of law should be granted in its favor because plaintiff failed to show that Rene was acting in the course and scope of his employment.

For all of the reasons stated in the proceeding section, this argument has no merit.

---

[13] In its discussion of the effect of presumptions the defendant again strays from the law as stated in *Pacheco*. Defendant asserts that the presumption established in the case at bar is of the type which disappears upon assertion of contrary evidence by the opposing party. This is a misstatement of the law. The presumption in this case arose *exactly* as it arose in *Pacheco*; the ownership of the vehicle by the defendant and the employment of the driver by the defendant were proven in both cases. Under these circumstances, the Pacheco court wrote:

*Section 812(a) makes it clear that a presumption such as the one which arose here continues to exist.* This is reinforced by the provision in § 812(b) dealing with presumptions which arise from facts which do not have probative value as evidence of the presumed fact. In such a case the statute provides that the presumption disappears as if it had never existed, if evidence is introduced which is sufficient to support a finding of the non-existence of the presumed fact. All this makes it abundantly clear that in the present case the presumption will continue to have existence even in the face of any evidence which the [defendant] may produce contradicting the factual elements from which the presumption arose.

*Id.* at 1238. (Footnotes omitted, emphasis added.)

## IV: Defendant argues that it should be granted a new trial so that the jury may consider the negligence of the third party who abandoned the vehicle on the highway.

The Court denied defendant's request to submit this issue to the jury on the grounds that there was no evidence in the record to support a finding that a third party had been negligent. While both plaintiff and defendant rehashed this issue in their post-trial submissions to the Court, the issue was thoroughly briefed at trial and the parties' substantive arguments are found in those pre-verdict briefs. The crux of defendant's argument is that Virgin Islands law makes it a public nuisance to abandon a vehicle in the roadway and a traffic violation to park illegally. Therefore, Esso argues, the third party who was the driver of the truck was negligent per se. However, as plaintiff points out, defendant did not go far enough in its presentation of proof. In *Baumann v. Canton* 7 V.I. 60 (D.V.I. 1968) this Court stated that

> the mere fact that an automobile which is involved in an accident is being operated in violation of a regulation does not render the driver of the vehicle guilty of negligence as a matter of law if there are any facts which will excuse his conduct.

*Id.* at 69.

In the case at bar, evidence was presented that the driver of the abandoned vehicle flagged down an emergency medical vehicle and asked the driver, Mr. Steven Hulett, for a ride. Mr. Hulett declined to give the man a ride, but did inform him that he would contact the proper authorities and have the car removed from the roadway. Mr. Hulett then testified that he did in fact call the authorities and reported the location of the car. Therefore, the record suggests that the driver of the third car had taken proper steps before the accident to remove the hazard caused by the vehicle. Far from proving the negligence of the owner/driver of the abandoned automobile, the record shows that the driver took the steps required of him.[14]

---

[14] Defendants never did suggest that the government was negligent in failing to remove the vehicle. This might have proven a more fruitful course of action. *See, Collins v. Government of Virgin Islands,* 236 F. Supp. 441, (D.V.I. 1964) *rev'd on other grounds,* 366 F.2d

■ Even evidence that the operator of the abandoned vehicle acted negligently would not have been enough. The defendant's evidence would have to have shown that the operator's negligence was the proximate cause of Mr. Williams injuries—a proposition for which there is no evidence in this record. In fact, the record contains substantial evidence to the contrary, showing that the proximate cause of the accident was Mr. Rene's breach of his duty to operate his vehicle with reasonable care. In a video-taped deposition shown to the jury, police officer Keith Williams stated that the cause of the accident was Mr. Rene's failure to keep a look out and failure to operate his own vehicle with due care.

In sum, there simply was no evidence presented by either party of the negligence by the phantom operator of the third vehicle. If anything, the evidence on the record relating to the abandoned vehicle tends to reaffirm, not weaken, plaintiff's contention that it was Mr. Rene's negligence which caused the accident.

### V: Defendants argue that Dr. Pedersen was improperly excluded as a witness and that a new trial should be granted so that he may testify.

Before taking any evidence, during voir dire, the Court ruled at a sidebar conference that defendant would not be permitted to offer Dr. Walter Pedersen as a witness at trial. Defendant now argues that this ruling constituted an abuse of discretion by the Court warranting a new trial. Plaintiff, not surprisingly, disagrees. Defendant's submissions to the Court indicate that Dr. Pedersen was one of plaintiff's treating physicians in the periods prior to and immediately following the accident. Plaintiff does not deny that Dr. Pedersen was a treating physician, but also claims that Dr. Pedersen was retained by his counsel, Ms. Dowling, as an expert consultant who was not expected to be called as a witness. Apparently, early on in the litigation, Dowling requested a medical report from Dr. Pedersen and paid a fee for this report.

---

279 (3d Cir. 1966) (the Government of the Virgin Islands was negligent for not having removed an abandoned automobile from the highway after having been apprised of its location and the fact that it constituted a hazard).

## A. *Testimony of Dr. Pedersen:*

Because he contends that Dr. Pedersen was a consulting expert, plaintiff argues that discovery of facts known by Dr. Pedersen may only be had "upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means." FED. R. CIV. P. 26(b)(4)(B). Defendant does not claim that it ever attempted to make such a showing. Instead, Esso contacted and interviewed Dr. Pedersen without even notifying plaintiff.

The case presented by plaintiff, to support his argument, is *Durflinger v. Artiles*, 727 F.2d 888 (10th Cir. 1984). In this case the U.S. Court of Appeals for the 10th Circuit upheld the decision of a trial judge denying defendant's request to present testimony by a medical expert who had previously been retained by plaintiffs. The important difference between that case and this one is that it appears from the opinion that the doctor in *Durflinger* was not the plaintiff's treating physician and, therefore, presumably did not have knowledge of the case prior to his involvement in the trial preparation stage.[15]

█ Despite the fact that FED. R. CIV. P. 26(b)(4)(B) is inapposite, the Court's ruling finds support in Virgin Islands law. While the there is no Appellate Division case on point, both the Territorial Court and this Court have adopted the same specific procedures for contacting an opposing party's treating physician with an eye toward safeguarding the confidences inherent in a doctor-patient relationship. In *Chase v. People's Drug Store*, 24 V.I. 183, 185, 187 (Terr. Ct. 1989) the Territorial Court of the Virgin Islands con-

---

[15] This distinction is important since the comment to Rule 26(b)(4) states:

It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be considered an ordinary witness.

The concept embodied in this section of the comments has been cited in several district court cases in this circuit, though not by the U.S. Court of Appeals for the Third Circuit itself, as far as the Court can determine. *See, MacDonald v. United States*, 767 F. Supp. 1295 (M.D. Pa. 1991); *Manion v. N.P.W. Medical Center Inc.*, 676 F. Supp. 585 (M.D. Pa. 1987); *Keith v. Van Dorn Plastic Machinery Co.*, 86 F.R.D. 458 (E.D. Pa. 1980); *Harasimowicz v. McAllister*, 78 F.R.D. 319 (E.D. Pa. 1978). In almost every one of those cases in which the court was confronted with a plaintiff's attempts to shelter his own treating physician from discovery under the mantle of Rule 26(b)(4)(B), the court rejected the argument and authorized defendant's discovery requests. Therefore, plaintiff's reliance on this particular argument is misplaced.

fronted a case with similar facts. In that situation Territorial Court Judge Petersen ordered the parties to follow the procedure laid out in *Stempler v. Speidell* 100 N.J. 368, 495 A.2d 857 (N.J. 1985). In *Stempler,* a medical malpractice case, the plaintiff attempted to bar all contact between the defendant doctor and plaintiff's other treating physicians. The court, however, held that ex parte communications would be permitted (and forced plaintiff to comply) but imposed certain conditions on those contacts. The court required that (1) plaintiff's counsel receive reasonable notice of the time and place of the ex parte contact, (2) that plaintiff's treating physician be notified of the anticipated scope of the interview, and (3) that it be communicated with clarity to plaintiff's treating physician that his or her participation in the ex parte interview is entirely voluntary. *Id.* at 864.[16]

Defendants argue that their contacts with Dr. Pedersen were proper because they had obtained a broadly-worded release from Mr. Williams which they claim allowed them to have unfettered ex parte communication with Mr. Williams' doctors. However, this argument fails since a very similar authorization had also been provided by the plaintiff in *Trantham and Ricker v. Mok,* Civ. No. 324/1987, Dist. Ct. Div. of St. Croix (Order of Magistrate Judge Resnick, July 11, 1989) and this court still required the parties to follow the procedures set out in Stempler.

■ Based on the clear mandate of local law, defendant's ex parte contacts with Dr. Pedersen were inappropriate. This Court's decision to sanction defendant by not allowing Dr. Pedersen to testify would have been appropriate on those grounds alone—but other circumstances surrounding the defendant's handling of this witness essentially required the Court to bar his testimony. First of all, at the time, of the Court's ruling it had become clear, both in discussions at side bar, and in defendant's submissions to the Court, that defendant's counsel intended to attempt to elicit expert opinions from Dr. Pedersen—despite the fact that Dr. Pedersen had

---

[16] This process for handling ex parte communications with a party's treating physician has also been approved by this Court in *Trantham and Ricker v. Mok,* Civ. No. 324/1987, *Dist. Ct. Div. of St. Croix (Order of Magistrate Judge Resnick, July 11, 1989) and James v. General Offshore Corp.,* Civ. No. 1989/271, Dist. Ct. Division of St. Croix, (Order of Magistrate Judge Resnick, July 10, 1992).

238

not been included in the pre-trial scheduling order as an expert, nor had Dr. Pedersen provided a report of his opinions to plaintiff's counsel as required by FED R. CIV. P. 26(b)(4)(B). (Tr., vol. I at 23-24.) The need for this sanction becomes all the more clear when one considers that Magistrate Judge Resnick had actually restricted the time during which plaintiff could depose Dr. Pedersen to thirty minutes relying on Mr. Cole's representations that Dr. Pedersen would only be called as a fact witness. A final compounding consideration in the Court's decision on this point is the fact that defendant's attorney knew better than to make ex parte communications with a plaintiff's treating physician without following the procedures in *Stempler*. The fact is that Mr. Cole was counsel in one of the cases of this Court (*James v. General Offshore Corp.*, Civ. No. 1989/271, Dist. Ct. Division of St. Croix, (Order of Magistrate Judge Resnick, July 10, 1992)) in which the defendant was required to provide notice prior to ex parte contact with plaintiff's physician according to the procedure laid out in *Stempler*.

## B. *Dr. Pedersen's Records:*

Finally, defendants also complain that Dr. Pedersen's records were not admitted. They seem to lump this into the same sanction as above. The contention of the defendant on this point is not accurate, however. The Court did exclude *testimony* by Dr. Pedersen, however, the Court did not make a blanket ruling as to whether or not Dr. Pedersen's records would be admitted into evidence. Instead, the Court dealt with the records as they came up at trial on a case by case basis. The real problem was that defendants repeatedly attempted to move the records, which had not been authenticated,[17] into evidence *during plaintiff's case in chief*. For this reason, in accordance with the its responsibility under FED. R. EVID. 611(a), the Court initially sustained plaintiff's objections when defendants attempted *admit* the records during

---

[17] Certainly, because Dr. Pedersen's testimony had been barred, defendant would have faced certain difficulties in authenticating some of Dr. Pedersen's records at trial. Defendant's counsel admitted that these difficulties would not have been insurmountable however, since defendant could have subpoenaed someone from Dr. Pedersen's office to authenticate the records. (Tr. vol. I, at 50.)

their questioning Dr. Nelson. (See, Tr., vol. I at 169-172.) Nevertheless, the Court did ultimately allow Mr. Cole to cross-examine Dr. Payne thoroughly about the records (See, Tr., vol. II at 45) in accordance with FED. R. EVID. 705. Moreover, because of the issue involving Dr. Montilla's records (discussed under issue VII, below), Dr. Nelson returned later in the trial—during the presentation of defendants' case—and yet Mr. Cole made no effort to question Dr. Nelson with respect to the various medical records at that time. In fact, defendants never made any attempt during their own case in chief to authenticate Dr. Pedersen's records so that the same might be properly admitted into evidence.

The fact is that defendants never properly authenticated the records in question and never attempted to introduce the records in the proper order of proof. Despite this, the Court allowed the defendant to use the records in cross-examining the plaintiff's expert witnesses who had had access to these records when formulating their expert opinions. (See, Tr., vol. II at 34-35.) For all of these reasons the Court's rulings were proper and there was no prejudice to defendant due to any of the Court's rulings regarding Dr. Pedersen's records.

### VI: Defendant argues that plaintiff's personnel records were improperly excluded and that a new trial should be granted to afford the jury the chance to examine these records.

The documents in question (exhibits D-7 and D-17) are discussed at several places in the record (See, Tr., vol. IV at 93-96, 156-157) and consist of two worker's compensation forms filled out by Veronica Frorup, a Personnel Assistant at WAPA. The forms specify that Mr. Williams injured his back once in 1981 and once in 1983 while at work.

In their submissions to the Court, each party states a different view of the reason the records were excluded. The defendant contends (1) that plaintiff stipulated at trial that the documents were in Mr. Williams' personnel file and that they met the requirements of FED. R. EVID. 803(6); (2) that the reason that the records were not authenticated was that the Court refused to allow Ms. Frorup to testify at trial as to the authenticity of the records; and (3) that the Court did not allow Ms. Frorup to testify out of a

belief that the records had to be authenticated by an employee of the Department of Labor ("DOL"). Plaintiff, on the other hand, argues (1) that the stipulation did not include an agreement that the documents were admissible under FED. R. EVID. 803(6); (2) that he did not object on the grounds that a witness from worker's compensation (DOL) had failed to testify; and (3) that Ms. Frorup did not testify because she had not been listed as a witness for the defendant in the final pretrial order.

What actually occurred at trial is as follows: plaintiff did stipulate that the record was in his WAPA personnel file and that it was authentic (Tr., vol. IV at 94). Plaintiff did not stipulate that the record was admissible under FED. R. EVID. 803(6). Moreover, plaintiff made no argument about whether or not Ms. Frorup was included on the final pre-trial order. Although Ms. Frorup's name was not included in the order, "Custodian of Personnel Records, V.I. WAPA" was so listed (Fin. Pre-Trial Ord. at 13.) In addition, defendants had named as a potential witness the "Custodian of Worker's Compensation Records and/or other representative of Dept. of Labor, Worker's Comp. Div." *Id.* Despite this, defendants never called a representative of DOL during trial. Ms. Frorup did not take the stand because plaintiff had already stipulated that the record was authentic. (Tr., vol. IV at 94)

■ ■ The Court's refusal to admit plaintiff's personnel records was based on the hearsay rules. While defendants never actually clearly stated the purpose for which they wanted these records admitted, the Court inferred that defendant's trial counsel moved the exhibits because he wanted to prove that Mr. Williams had received a back injury serious enough to cause him to miss work and receive worker's compensation.[18] Unfortunately for defendant, the forms found in plaintiff's WAPA personnel files were hearsay under FED. R. EVID. 801(d) and could not be used to

---

[18] The Court's inference on this point was necessary because counsel never put on the record why he was attempting to move these documents into evidence. Plaintiff's earlier injuries to his back had been well-established by plaintiff's own witnesses before defendant attempted to move D-7 and D-17 into evidence. Therefore the Court was left to infer that defendants were trying to use these records to prove that one or more of plaintiff's prior back injuries had been severe enough to cause him to miss work and receive worker's compensation.

"prove the truth of the matter asserted," that is, that Mr. Williams had received worker's compensation for a debilitating injury. Moreover, the proffered forms lacked any probative value on this issue since they only showed that a claim form had been filled out by WAPA—not that the claim was submitted to DOL, not that the claim was ever approved by DOL, not that Mr. Williams ever received worker's compensation, nor even that theses injuries were serious back injuries. Only a representative of DOL could have testified as to whether or not plaintiff's claim was actually approved and he received worker's compensation payments for these prior injuries to his back. For this reason, the only documents which would have been admissible under FED. R. EVID. 803(6)—to prove that Mr. Williams's received worker's compensation for an earlier debilitating work-related injury—were records in DOL's files. Defendants did not attempt to admit any such records, nor did they attempt to call any authentication witness from DOL.

Finally, all of this is irrelevant to this motion for a new trial, since defendants suffered no prejudice even if the records were improperly excluded. During counsel's cross-examination of Mr. Williams, the plaintiff admitted that he had injured his back in 1981 and 1983 and that each time the injury was severe enough to keep him out of work for a substantial period of time. (See, Tr., vol. III at 58-59, 62-63.) This testimony is far more probative of the fact that plaintiff had previously injured his back than the WAPA records would have been and therefore the exclusion of exhibits D-7 and D-17 was harmless at the very worst.

### VII: Esso argues that it is entitled to a new trial based on plaintiff's failure to provide discovery, specifically information regarding plaintiff's visit to Dr. Montilla.

The Court entered a fairly extensive order on this issue during the course of the trial in response to defendants' motion for a mistrial.[19] Despite this, defendant nevertheless again raises this

---

[19] See, Defendants' Motion for Mistrial Due to Plaintiff's Failure to Supplement Discovery and Make Timely Disclosure of Critical Evidence and For Other Reasons, filed Sept. 22, 1994; and *Williams v. Rene and Esso*, No. 1991-231 (D.V.I. filed Sept. 26, 1994) (Ord. denying Defs.' Motion for a Mistrial).

issue in its post-trial motion. The issue arose at trial because defendants argued that plaintiff had not delivered to them a particular x-ray report in a timely fashion, and that plaintiff had provided incomplete answers to pre-trial interrogatories. Defendants further argued that these actions constituted prejudice to the defendants sufficient to require a mistrial. At a hearing on this issue on September 23, 1994 at the close of plaintiff's case, defendants argued that, had they known about plaintiff's visit to Dr. Montilla on September 14 or 15, 1994, when such information was also known to the plaintiff, instead of on September 20, 1994 when defendants actually obtained the information, they might have conducted their case differently. Without holding that defendants had actually been prejudiced by their delayed knowledge about Dr. Montilla, the Court found that it was possible that prejudice may have occurred and ordered certain remedial measures. These measures included: allowing defendants to re-cross-examine Drs. Payne and Nelson using the x-ray report, allowing the admission of the x-ray report, and allowing defendants to bring Dr. Montilla as a witness despite the fact that he had not been included in defendant's list of witnesses in the pre-trial order.

At this stage, defendant makes three arguments: 1) an evidentiary hearing should have been held concerning the failure to provide discovery; 2) plaintiff's failure to provide certain discovery deprived Esso of a "reasonable opportunity to prepare and present its case;" and 3) a new trial is warranted because the issue of causation is "central to the case." The Court will examine each of these contentions in order.

A. *Is the Court's failure to conduct an evidentiary hearing grounds for a new trial?*

■ Since there is no requirement that the Court hold an evidentiary hearing regarding the untimely delivery of the x-ray report, the Court's failure to do so provides no ground for a new

trial. The cases relied on by defendant are simply inapposite[20] and/or not controlling in this jurisdiction.[21]

Despite the fact that it was not required, this Court did hold a relatively lengthy hearing, outside the presence of the jury, received affidavits from counsel for both parties, and determined that no additional evidentiary hearing — and resulting delay in the trial — was needed. (See, Tr., vol. IV at 18-51) After hearing the litigants' arguments, and reading the submissions of the parties, the Court denied the motion for a mistrial. The Court was, and is, satisfied that there was no deliberate misconduct involved in the delayed delivery of the x-ray report and that the remedial measures taken by the Court (discussed below) cured any prejudice that may have resulted from the delayed disclosure of the plaintiff's visit to Dr. Montilla.

B. *Did plaintiff's failure to disclose his visit to Dr. Montilla cause prejudice?*

Both plaintiff and defendants cite *Seaboldt v. Pennsylvania R. Co.*, 290 F.2d 296 (3d Cir. 1961) as support for their arguments. While the Court has acknowledged that that case bears some striking factual similarities to the instant case, it does not provide authority for the grant of a mistrial. In *Seaboldt*, also a personal injury case, counsel for plaintiff told the counsel for defendant that he did not know the name or whereabouts of a chiropractor who had treated the plaintiff prior to the accident. Sometime during the trial it became clear that the counsel for the plaintiff did indeed know the

---

[20] *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672 (3d Cir. 1980) was the primary case cited by defendants during the hearing to support their contention that an evidentiary hearing is required—but *Ingersoll-Rand* provides no authority for this assertion. It is true that, upon review, the U.S. Court of Appeals for the Third Circuit commented on the fact that the defendant in that case had not requested a hearing on the question of whether the delayed discovery in that case was caused by counsel's deliberate misconduct—but the Court in no way held that any inquiry is required, let alone a full-blown evidentiary hearing.

[21] Another case cited by defendants, *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988), is not controlling in this jurisdiction and does not provide authority for their contention. Defendants correctly assert that the U.S. Court of Appeals for the First Circuit in *Cryovac* required the trial court to hold an evidentiary hearing on remand in order to determine the level of culpability involved in the failure to disclose a particular piece of evidence. However, the U.S. Court of Appeals for the First Circuit restricted its holding to the facts of that case (*Id.* at 930) and made no pronouncement as to what sort of evidentiary hearing was required.

name and whereabouts of the chiropractor. As a result, the trial judge reopened the case and heard testimony from the chiropractor. On appeal, the U.S. Court of Appeals for the Third Circuit found that the actions of the trial judge had not adequately cured the prejudice that might have occurred in the trial court. In granting a new trial, the court stated:

> It is true that we cannot say for a certainty that previous knowledge of this chiropractor's identity and what he was going to say would have changed the case from a verdict for the plaintiff to one for the defendant or have changed the amount of the verdict. But it would have made a difference in Railroad counsel's approach to the testimony of several witnesses. Among these would have been the testimony of the plaintiff himself and that of his wife. The plaintiff's case on the subject of damages was that he suffered this severe injury to his back as a result of the accident which, in turn, was the fault of the Railroad. The chiropractor gave testimony that he had treated the plaintiff previously for a "chronic" back ailment. Cross-examination of both the plaintiff and his wife could have gone much further than it did into this question.
>
> There was also the question of the evidence of Dr. Scott, a neuro-surgeon who appeared as a witness for the plaintiff. . . . Had Railroad's counsel been in the possession of what the chiropractor had to say, it could well be that questions put to the surgeon based on what the chiropractor had said could have had some effect upon Dr. Scott's approach to the medical problem.

*Id.* at 299.

■ While *Seaboldt* is instructive, there are important distinctions in the case at bar. First, in *Seaboldt* the plaintiff's counsel apparently knew the name and whereabouts of the chiropractor and willfully withheld it from the defendant until the very end of trial, despite inquiries from defendant's counsel. Nothing so nefarious occurred here, rather, Mr. Williams' attorney apparently attempted to provide the relevant information to the defendants on September 16, 1994 (the Friday before trial) and within twenty-four (24) to forty-eight (48) hours of receiving it herself. While the document in question was inadvertently not provided to defen-

245

dants until September 20, 1994 (the second day of trial), the Court found that this delay in transmitting the information was neither willful nor intentional.

A second, and most important, difference between Seaboldt and the instant case is that, here the defendants had not even begun to present their case when the evidence was discovered, and defendants still had the opportunity to cure whatever prejudice might otherwise have occurred. At the hearing September 23, 1994, defendants argued that they would have done several things differently had they known of Dr. Montilla when plaintiff first remembered the fact that he had visited Dr. Montilla. Defendants stated that they would have been able to cross-examine Drs. Payne and Nelson using the information gleaned from Dr. Montilla and that they might have desired to present testimony by Dr. Montilla himself.[22] The Court's order, entered following the hearing, gave defendant the opportunity to cure any prejudice:

> For all of these reasons, the Court will deny the motion for a mistrial. However, the Court will allow plaintiff witnesses, Drs. Payne and Nelson, to be recalled so that defendants have the opportunity to cross-examine these witnesses using the documents and information they have gleaned from the fact that Dr. Montilla apparently examined the plaintiff in April of 1990. In addition, should defendant desire to call Dr. Montilla as a witness the Court will allow it. Also, the Court urges the defendants to make the information about Dr. Montilla's examination of the plaintiff available to their experts in order that they may give the most complete testimony possible. Finally, the Court will allow the defendant to place into evidence Dr. Montilla's other medical records pertaining to his examination Mr. Williams.

*Williams v. Rene and Esso*, No. 1991-231 (D.V.I. filed Sept. 26, 1994) (Ord. denying Defs.' Motion for a Mistrial) at 5.

---

[22] Defendants also stated in oral argument that they might have chosen to present a neurosurgeon as an expert medical witness instead of the orthopedist they listed in the pre-trial order. The Court rejected that argument. Defendant knew well in advance of trial, and far in advance of the revelations about Dr. Montilla, that this case involved issues pertaining to neurological injury. With all of this knowledge, defendants still chose not to designate a neurosurgeon as an expert witness.

Defendants' conduct in the wake of this order makes it clear that no prejudice occurred. First, defendants did not move the untimely-produced records into evidence. Second, defendants did not even attempt to call Dr. Montilla as a witness.[23] Third, after requiring plaintiff to fly Dr. Nelson back to St. Croix from St. Thomas, defendants' counsel failed to ask the doctor any probative questions related to the x-ray report.[24] Finally, while Dr. Payne was not able to return to the trial to be re-examined by defendants' counsel,[25] this was not prejudicial to defendants since defense counsel actually discovered Dr. Montilla's x-ray report during defendants' initial re-cross of Dr. Payne. This exchange then occurred:

> Q Doctor, yesterday when Dr. Nelson testified, he told us that Mr. Williams had related to him that he had had a lumbosacral spine X-ray a few months prior to this accident. Now, were you ever given a lumbosacral spine X-ray taken a few months after (sic) the accidents?
> A Yes.
> Q You were?
> A Yes.
> Q When were you given that X-ray?
> A I don't know. I suppose with the pile of information that came. I've had information mailed to me along the way.
> Q Do you have a lumbosacral spine X-ray that was taken between 1986 and the accident in 1990?
> A I would have to look for it. It was taken April 27 of '90.

(Tr., vol. II, at 67).

Notably, even after learning of the x-ray from Dr. Payne, defendants' counsel asked no further questions about it, nor did he

---

[23] There is no evidence on the record that defendants made any attempt to bring Dr. Montilla into Court to testify despite the Court's order allowing them to do so. It is possible, however, that defendants chose not to do so because Dr. Montilla, residing in Puerto Rico, was outside of the Court's subpoena power.

[24] Defendant did this despite the fact that plaintiff's attorney informed the Court and defendants' counsel (off the record) that she had arranged for Dr. Nelson to confer with Dr. Montilla over the weekend so that he might be prepared to answer any questions that defendants had regarding the record.

[25] Dr. Payne left for California after her initial testimony and the Court was informed on September 23rd, that she would be unavailable until October 6th.

247

press the doctor to give any opinion as to whether this piece of evidence had any effect on her assessment of the cause of Mr. Williams' injuries. Also notable is plaintiff's counsel's exchange with Dr. Payne on re-direct:

Q From all the documents and all the medical records, including all the ones that Attorney Cole just asked you about, is there any evidence in any of those records in any of those reports that he had an injury to his disk such as a bulging disk prior to this injury?
A No.
Q Is there any evidence in any of those records of any radiculapathy or any nerve damage?
A No, there wasn't.
Q And if Mr. Williams had had a bulging disk prior to this injury, would he have had nerve damage?
A Yes.
Q And would that nerve damage been evident by any of the examinations taken prior to this injury?
A It should have been, yes.

(Tr., vol. II at 71)[26]

█ Defendant's protestations notwithstanding, there is simply no evidence that plaintiff's failure to timely remember his visit to Dr. Montilla and the related failure to timely provide defendants with Dr. Montilla's x-ray report prejudiced the defendants. As has been demonstrated, the Court took strong and immediate measures to cure whatever prejudice might have occurred by allowing defendants several opportunities to make use of the lately discovered records and information. Having chosen not to utilize the evidence nor any of the information gained from it in its case in chief, defendant cannot now claim prejudice.

---

[26] Two other issues raised in the record are also worth mentioning briefly: 1) both Dr. Payne (Tr. vol. II, at 69-70) and Dr. Nelson (Tr. vol I, at 191-192) testified that it was normal that Mr. Williams had not recalled every medical consultation and x-ray to his back and that they believed Mr. Williams to be truthful; and 2) there is mention in the trial record by Mr. Cole, of an alleged x-ray report having been taken one week before the accident. The Court is unable to find any such record, and despite Mr. Cole's comments during trial, the motion for a mistrial was clearly based on the April 27, 1990 records of Dr. Montilla—not upon an X-ray report taken one week before the accident.

## C. *Does the late production of this information necessitate a new trial on the issue of causation?*

Plaintiff's untimely recollection of his visit to Dr. Montilla and the untimely production of Dr. Montilla's x-ray report in no way necessitate a new trial. First of all, despite his allegations that the x-ray report might go to the issue of causation, and the Court's express order that the record would be admitted, Counsel for defendants never moved the record into evidence despite ample opportunity to do so. (Tr., vol. IV at 153-158.) In addition, as was stated above, when Dr. Nelson was re-called at the request of defendants, counsel failed to ask any causation-related questions pertaining to the untimely-produced x-ray report. (Tr., vol. IV at 151-153.) Moreover, when plaintiff called Dr. Nelson as a rebuttal witness the following exchange took place:

> Q Doctor, you're still under oath. Doctor, did you review the x-ray report of Dr. Montilla?
> A Yes.
> Q And what did it show?
> A It showed some mild arthritis in the lower back.
> Q Was there anything that the X-ray report showed in April of 1990—was there any indication whatsoever that Mr. Williams was suffering from a disk condition?
> A No.
> Q And knowing what you know about Mr. Williams, would you have expected mild arthritis in his back?
> A Yes.

(Tr., vol. IV at 158-159.)

Finally, although Dr. Payne was unable to return to St. Croix in order to be re-cross-examined with respect to the x-ray report, defendants were able to question Dr. Payne with the x-ray report on their first cross-examination, and the record shows that Dr. Payne had considered the x-ray before rendering her opinion at trial. In addition, during Ms. Rohn's direct examination of Dr. Payne, the following exchange took place:

> Q You reviewed those doctor's records? [Note: Counsel here is referring to all of the medical records received by Dr. Payne, not merely Dr. Montilla's X-ray.]
> A Yes.

Q Was there anything in those records to lead you to believe that there was the slightest bit of possibility that Mr. Williams' injury occurred anywhere besides in December of 1990?

A No. He never had neurological symptoms at the time of our findings.

(Tr., vol. II at 33-34.)

For all of these reasons, and especially because defendants never moved the offending x-ray report into evidence, defendant's arguments that this lately-produced document was critical to the issue of causation must be considered facetious.

### VIII: Defendant argues that plaintiff's counsel improperly suggested an ultimate figure for the jury to award in this case.

Defendant relies on the case of *Waldorf v. Shuta*, 896 F.2d 723, 743-744 (3d Cir. 1990) in arguing that plaintiff's counsel impermissibly influenced the jury with regard to the amount of damages that should be awarded. Again, defendant's arguments miss the mark. In *Waldorf* the plaintiff claimed that he intended, prior to the accident, to become a lawyer and that therefore his lost future earnings should be calculated as if he had actually become a lawyer. The evidence that Mr. Waldorf was likely to become a lawyer was sparse, however. As the court wrote, Mr Waldorf

> was a 24-year old high school drop-out who had obtained his high school equivalency diploma in the military. He had worked as a paralegal in the military, but had been unable to find employment as a paralegal in civilian life; he had entered and dropped out of the New York Police Academy; he had been refused admission to a four-year degree program and had completed one year of a two-year Associate Degree Program at the College of Staten Island. At the time of the accident, he was taking six courses, three of which were photography, tennis and acting. While there is no reason to doubt Waldorf's aspiration to become a lawyer, no credible evidence had been presented that he had the ability to become a lawyer.

896 F.2d at 742-743.

250

Despite the lack of foundation, the trial court in *Waldorf* allowed evidence to be presented to the jury that Mr. Waldorf's future earnings would have been approximately $3.8 million had he become a lawyer. In his closing argument, Mr. Waldorf's counsel stated

> You heard the testimony. You saw the man. . . . And if you find that, you find the final figure, his loss of $3,799,000 will make it whole. It doesn't make him whole. You want to know the truth: That's peanuts. *That's peanuts for the price that should be paid for what this man went through.*

\* \* \* \* \*

> So you take the $3 million. That's just the beginning. That's peanuts, because the real loss is not monetary, . . . What kind of money can pay him back? $3,799,000? *That's peanuts. That's a small part of what he should be paid for the kind of injuries that he's received, for the pain and suffering.* . . .

896 F.2d at 744 (italics and omissions in the original.)

The U.S. Court of Appeals for the Third Circuit found that this closing argument constituted a request for a specific dollar amount for *pain and suffering. Id.* at 744. Referring to the above cited argument by counsel, the court wrote:

> Does the above scenario represent an argument by plaintiff's counsel for a specific amount of damages for pain and suffering? We think it does. It constitutes a plea for, at a minimum, an award of $3,799,000 for the elements of pain and suffering. As to the intended impact of counsel's proposed mere "peanuts" multiplier factor, it is unclear how high a multiplier he was suggesting. But any jury would have to think that counsel was urging that the $3,799,000 should be doubled, tripled quadrupled or enhanced even more.

*Id.* at 744. It is clear from this passage that the *Waldorf* court was primarily concerned with the problem of counsel suggesting a specific number for non-economic, pain and suffering damages. They found that Mr. Waldorf's counsel's use of a future earnings amount which was not supported by the evidence, and his

statement that that number constituted "peanuts" compared to what Mr. Waldorf really deserved, was actually an impermissible suggestion of a specific number for pain and suffering.

 Nothing like this occurred in the case at bar. First of all, there has been no allegation by defendant that Dr. Pettingell, plaintiff's economist, impermissibly inflated his estimate of Mr. Williams' future earnings. Second, counsel, in the portion of her closing arguments relating to damages kept her discussion of economic and non-economic damages completely separate. When she was talking about economic damages, she simply re-capped Dr. Pettingell's testimony which was both compelling and essentially unrefuted by the defendant. (Tr., vol. V at 42-44.) After she had reviewed the substance of Dr. Pettingell's testimony, she then shifted into a discussion of non-economic damages in which she included pain and suffering, mental anguish and loss of enjoyment of life. Throughout her entire discussion of non-economic damages (Tr., vol. V at 44-47), plaintiff's counsel never stated a specific dollar amount. For the most part she catalogued the alleged deficiencies in Mr. Williams' life after the accident. Her only reference to money was to make statements like "I ask you to fully compensate Mr. Williams such that money can for that pain." (Tr., vol. V at 46.) It is beyond dispute that counsel's closing argument contained powerful and compelling advocacy, as well as a review of the testimony presented by Dr. Pettingell, including the numbers he cited. This recitation and argument may well have influenced the jury, and may well have hurt the defendant's case, but it did not amount to an improper suggestion of a dollar figure to the jury or violate any standard established in *Waldorf*.

### IX: Defendant argues that the verdict was against the weight of the evidence and that therefore the Court must order a new trial on damages.

Perhaps the most difficult issue posed in the defendant's post-trial motion is its argument for a new trial based on the assertion that the verdict was against the weight of the evidence, or in the alternative, for a remittitur. The bulk of defendant's argument constitutes a recitation of U.S. Court of Appeals for the Third

Circuit cases in which the jury awards were remitted to less than $500,000. The Court recognizes that the U.S. Court of Appeals for the Third Circuit has remitted large jury awards—and has expressed concern that jury awards in the Virgin Islands tend to be especially high. However, the size of jury awards in other cases, and their subsequent treatment by the U.S. Court of Appeals for the Third Circuit, is only the beginning point for our analysis. The most important issue for this Court, are the facts of this case and the law of this jurisdiction on remittitur.

 To begin, a decision to grant a new trial—or to order a remittitur—is the type of decision that necessarily invades the province of the jury. Therefore, such an action is not to be undertaken lightly.[27] In *Warner v. Lawrence*, 754 F. Supp. 449 (D.V.I. 1991) Judge Robert Carter, sitting by designation in this Court, quoted the *Lind* decision:

> A new trial may be granted if the verdict is against the weight of the evidence. *See, e.g. Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 88-90 (3d Cir.)(en banc), *cert. denied*, 364 U.S. 835, 81 S. Ct. 58, 5 L. Ed. 2d 60 (1960). The power to order a new trial on these grounds, however, is sparingly exercised, and a verdict may not be set aside merely because the judge would have reached a different result if he were the finder of fact. *See id.* Respect for the function of the jury, as dictated by the Seventh Amendment, requires the court to "abstain from interfering with the

---

[27] Plaintiff's brief provides two Third Circuit cases which stress that review of a jury award should be very narrow:
In *Walters v. Mintec/International*, 758 F.2d 73, 80 (3d Cir. 1985), we reiterated the general principal that the scope of this court's review of a damage award is "exceedingly narrow." We grant a new trial or remittitur "only if the verdict is 'so grossly excessive as to shock the judicial conscience.'" *Id.* (citations omitted.) It is not a sufficient basis to reverse if we find only that an award is extremely generous, or that had we been deciding, we "'would have found the damages to be considerably less.'" *Id.* (citations omitted.)
*Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1987) *cert. denied* 484 U.S. 913.
And, from the Third Circuit's opinion in *Keenan v. Philadelphia*, 983 F.2d 459, 472 (3d Cir. 1992):
The Third Circuit standard of review here has recently been stated: "Our review of this question is severely limited: We may . . . reverse and grant a new trial 'only if the verdict is so grossly excessive as to shock the judicial conscience.'" *Id.* (citations omitted.)

verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice." 6A J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 59.08[5] AT 59-150, 59-152 (2D ED. 1989) *quoted with approval in Lind, supra,* 278 F.2d at 89. Unless "the jury . . . fails properly to perform the functions confided to it by law," the court must let the verdict stand, lest "the judge . . . usurp the prime function of the jury as the trier of facts." *Lind, supra,* 278 F.2d at 90; *see, e.g. EEOC v. Delaware Dep't of Health & Social Servs.,* 865 F.2d 1408, 1413 (3d Cir. 1989).

754 F. Supp. at 453. Likewise, in *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.,* 746 F.2d 215 (3d Cir. 1984) the U.S. Court of Appeals for the Third Circuit stated that

A jury award of damages is not to be upset so long as there exists sufficient evidence on the record which, if accepted by the jury, would sustain the verdict. *Hourston v. Harvlan, Inc.,* 457 F.2d 1105 (3d Cir. 1972).

*Id.* at 219.

■ These cases suggest that in reviewing a jury verdict for excessiveness, the Court should consider whether or not the verdict is supported by the evidence presented at trial. This inquiry by the Court presents a logical and objective basis for the Court to examine the jury's verdict. The Court has observed the trial just as the jury did, and is in an excellent position to review the evidence in the record and make an assessment as to whether or not the verdict is reasonable in light of that evidence. In a very recent case, *Bolden v. Southeastern Penn. Trans. Auth.,* 21 F.3d 29, (3d Cir. 1994) the U.S. Court of Appeals for the Third Circuit reiterated the standard of review stated above. ("In reviewing the propriety of a jury verdict, our obligation is to uphold the jury's award if there exists a reasonable basis to do so." *Id.* at 32, n.1, citing *Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir. 1989)).

The Court is cognizant, however, that the sufficiency of evidence standard is not the only standard discussed in the law of this jurisdiction. The *Motter* court also wrote:

While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court may not vacate or reduce the award merely because it would have granted a lesser amount of damages. For the court to disturb a jury verdict, "the damages assessed by the jury must be so unreasonable as to *offend the conscience of the Court.*" *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir. 1979) (emphasis added).

883 F.2d at 1230. And in another case, the court used the words "shock the judicial conscience." *Edynak v. Atlantic Shipping, Inc.,* 562 F.2d 215, 226 (3d Cir. 1977) *cert. denied,* 434 U.S. 1034, 54 L. Ed. 2d 781, 98 S. Ct. 767 (1978) (quoting *Russell v. Monongahela Ry. Co.,* 262 F.2d 349, 352 (3d Cir 1958)).

██ The Court finds that defendant, in its memoranda and argument, has taken these more subjective standards out of context. In so doing, the defendants miss the portions of these decision which have the most meaning and provide real guidance to the Court. In the Motter decision, quoting *Murray v. Fairbanks Morse,* 610 F.2d at 152, the important phrase is: "For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.'" This phraseology suggests to the Court that an analysis of the status of the conscience of the Court is to be undertaken only after the Court has determined that the award itself is unreasonable. In other words, the Court need not determine whether or not its conscience is shocked, unless it first determines whether the award is reasonable—that is, whether the award is supported by the evidence. And, in fact, if the award is supported by the evidence, then the Court's conscience should not be shocked—even if it is tremendously surprised by—and even in disagreement with—the magnitude of the jury's generosity.

The most powerful authority for the proposition that this Court is obliged to uphold the jury's award if there is evidence to support it, comes from the Supreme Court itself. In *Grunenthal v. Long Island Railroad Company,* 393 U.S. 156, 21 L. Ed. 2d 309, 89 S. Ct. 331 (1968), the Supreme Court considered the case of a railroad employee who had suffered a severe injury to his foot and had sued his employer

255

the railroad. The jury awarded $305,000 and the and the U.S. District Court for the Southern District of New York denied the defendant's post-trial motion to set aside the award as excessive. The Railroad appealed, and the U.S. Court of Appeals for the Second Circuit ordered the trial court to grant a new trial unless the plaintiff agreed to remit $105,000 of the award. The Supreme Court then granted certiorari and reversed the *U.S. Court of Appeals for the Second Circuit*. 393 U.S. at 156.

The most illuminating aspect of the Court's opinion for our purposes is the procedure it followed in examining the two lower court decisions. First the Court noted that the trial court had examined the evidence presented at trial and determined that the Railroad's motion for a new trial must be denied because the "relevant evidence weighed heavily in favor of the jury's assessment." The Court then noted that the U.S. Court of Appeals for the Second Circuit, in reviewing the trial court's decision had applied the following standard in reviewing the trial court's decision:

> [We] appellate judges [are] not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.

393 U.S. at 159, quoting *Dagnello v. Long Island R. Co.*, 289 F.2d 797, 806 (1961).[28] Ultimately, the Supreme Court held that the U.S. Court of Appeals for the Second Circuit had erred by not performing a "detailed appraisal of the evidence bearing on damages" and proceeded to perform its own appraisal. 393 U.S. at 159-160. it

---

[28] This standard is quite similar to those of this circuit cited above. Indeed, in a footnote to this passage, the Supreme Court observed that the standard has been variously phrased: "Common phrases are such as: 'grossly excessive,' 'inordinate,' *'shocking to the judicial conscience,'* 'outrageously excessive,' *'so large as to shock the conscience of the court,'* 'monstrous,' and many others." *Dagnello v. Long Island R. Co., supra*, 289 F.2d at 802. 393 U.S. at 159 (emphasis added.) For this reason this Court is confident that the analysis applied by the Supreme Court in Grunenthal would apply equally to a case in this circuit.

reviewed the record and agreed with the trial judge that the evidence presented fully supported the jury's award both in terms of compensatory damages such as lost future earnings and in terms of pain and suffering. 393 U.S. at 161.

The Court also specifically highlighted the trial judge's comments regarding the fact that the defendant had done little to contest the evidence of damages at trial. The Court noted that

> [h]e [the trial judge] emphasized that 'the trial record here has many unusual features, the most outstanding one being the noncontroversial nature of the defense as to damages. The jury, impressed by the uncontroverted proof adduced by plaintiff, may well have adopted in toto its full significance and drawn such normal and natural inferences therefrom as the law endorses.'

393 U.S. at 158-159. The case at bar is marked by the same unusual feature of economic damages evidence standing essentially unrefuted. In both the *Grunenthal* case, and the case at bar, the jury was presented with a mountain of evidence tending to support a very large damage award—and little to dissuade such an award.

■ The question of whether or not the award is supported by the evidence must be the threshold question. If the award is not supported by the evidence, then the Court may proceed to determine whether the award is shocking or offensive and thus requires reduction. If, however, the award is supported by the evidence, the Court must, absent evidence of other irregularities such as passion, prejudice or bias,[29] uphold the award—even if it is exceedingly large as in the instant case. The most important consideration must be whether or not the jury has based the award upon the evidence.[30]

---

[29] Several cases have held that if the verdict does appear to be the result of passion, bias, or prejudice, the Court should not grant a remittitur, but instead must grant a new trial. *See e.g., Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993). No credible claim has been made here that the jury's award was the result of passion, bias or prejudice.

[30] This analysis is also supported by the Supreme Court's per curiam opinion in *Neese v. Southern R. Co.*, 350 U.S. 77, 100 L. Ed. 60, 76 S. Ct. 131 (1955). The Court wrote:
we find that the Court of Appeals was not justified, on this record, in regarding the denial of a new trial, upon a remittitur of part of the verdict, as an abuse of discretion.

This mode of analysis is further supported by the law guiding how a court should calculate the amount by which an award should be reduced once the court has determined that the award is unsupported by the evidence. Professors Wright and Miller write:

> There is some difference of opinion on the standard by which the court should be guided in determining the amount that is to be remitted from the verdict. One theory is that an excessive verdict should be reduced to the minimum amount that the jury might have awarded, since the award of any greater sum deprives the defendant of his right to a jury trial. Other courts have felt free to reduce the verdict, by remittitur, to whatever amount the court itself thinks the jury should have allowed. A final theory is that the jury by its excessive verdict intended to award the maximum and defendant cannot complain of any judgment within the permissible limits. This theory permits reduction only to the highest amount that the jury could properly have awarded. This is the only theory that has any reasonable claim of being consistent with the Seventh Amendment.

11 Wright & Miller, § 2815, at 104-105.

■ This passage suggests that the Court is bound by the Seventh Amendment *not* to remit the award unless it exceeds the maximum award that might be supported by the evidence on the record. Moreover, the U.S. Court of Appeals for the Third Circuit has adopted exactly this approach in several decisions on this subject. In *Kazan v. Wolinski*, 721 F.2d 911 (3d Cir. 1983) the U.S. Court of Appeals for the Third Circuit held that when a trial court does determine that a jury award is excessive, it should follow a particular procedure in determining the amount of the award to be remitted.

> The court then followed a proper procedure in cases such as this, where no clear judicial error or "pernicious influence"

---

For apart from that question, as we view the evidence we think that the action of the trial court was not without support in the record, and accordingly that its action should not have been disturbed by the Court of Appeals.
350 U.S. at 77.

can be identified but where the verdict is so large as to shock the conscience of the court: the court ordered plaintiff to remit the portion of the verdict in *excess of the maximum amount supportable by the evidence* or, if the remittitur were refused, to submit to a new trial.

721 F.2d at 914 (citations omitted and emphasis added.)

■ Perhaps more than any other case law on remittitur, *Kazan* and the many cases that follow it, convince this Court that a jury award may not be remitted unless it is unsupported by the evidence. If the guidepost for the Court in remitting an award is the *maximum* award supportable by the evidence, then how could the Court remit any award which was less than the maximum supported by the evidence? The answer is clear. The Court simply cannot remit any award which is reasonably supported by the evidence. To do so would be to impermissibly and emphatically invade the province of the jury—and do violence to the protection afforded by the Seventh Amendment of the Constitution.

Previous decisions by this Court have not explicitly strayed from the *Kazan* rule, nevertheless, in certain cases, the opinions of this Court have been somewhat misleading because of the way in which they have evaluated "reasonable." It is a special concern of this Court that, in the past, our practice sometimes has been to overlook the evidence before us in our rush to seek reassurance that other courts in other jurisdictions have upheld similar awards. That practice has apparently led to an impression that the most important factor in determining the reasonableness of a jury award is whether or not other courts have found similarly high awards to be "reasonable."[31]

---

[31] One case which gives this impression is *Erysthee v. El Nuevo Lirio Grocery*, 25 V.I. 307 (D.V.I. App. Div. 1990). In this case the Court properly quoted Virgin Island and U.S. Court of Appeals for the Third Circuit cases stating that a court's review of a jury award is extremely narrow. 25 V.I. at 312. The Court then went on to state that

> an indispensable element in the exercise of that discretion is the comparison of the case being considered to reported cases involving similar injuries. Only through such a comparison can a court determine whether an award is within the bounds of reason or represents an unwarranted spin of the "wheel of fortune" that many personal injury verdicts have shown exists in the Virgin Islands.

25 V.I. at 313. As authority for this statement, the *Erysthee* Court cited *Gumbs v. Pueblo International, Inc.*, 823 F.2d 768 (3d Cir. 1987) and *Couch v. St. Croix Marine, Inc.*, 667 F.

A more usual—and appropriate—use of the awards of other courts was conducted by this Court in *Brown v. McBro Planning and Dev. Co.*, 660 F. Supp. 1333 (D.V.I. 1987), 23 V.I. 242 (D.C.V.I. 1987). At oral argument on the instant motion, defendant argued that McBro stood for the proposition that the awards approved by other courts should be a major factor in determining what award is reasonable this case. This is not an entirely accurate, nor complete explication of the McBro decision, however. In McBro this Court explicitly found that its duty was to determine "the maximum award supportable by the evidence." *Id.* at 1338. The Court then went on to explain that in determining the maximum amount, it would consider the same factors that it had instructed the jury to consider. It then stated

> [i]n determining whether the award is so grossly excessive as to shock the court, the court considers factors such as: the severity of the injury, whether the injury is demonstrated by physical evidence or by subjective testimony of the plaintiff, whether the injury is temporary or permanent, the plaintiff's ability to continue with employment, the out-of-pocket expenses to plaintiff, and the amount plaintiff demanded in the original complaint.

*Id.* at 1338. In other words, the court should consider the evidence on the record.[32]

Supp. 223, 224 (D.V.I. 1987). When these opinions, and the pages to which the Court made reference, are examined, it becomes clear that these cases do not stand for the proposition that examining other case law is "an indispensable element" in the process of determining the maximum reasonable award in a remittitur situation. Instead, these cases were cited merely because they bemoaned the fact that jury awards in the Virgin Islands tend to be quite high. No authority is cited for the Court's assertion that, in determining what a reasonable maximum award is, it is "indispensable" for the Court to examine other awards.

[32] At the January 26, 1995 hearing, the defendant argued that the fact that plaintiff only estimated his damages at one million dollars in the final pre-trial order should be considered by the Court in determining whether or not the jury's award should be remitted. As support for this proposition, the defendant cited the *McBro* decision. Presumably, the defendant believes that in stating that the Court could consider the amount originally demanded in the complaint, the Court could also consider the pre-trial order. This court disagrees. The pretrial order is not something that is shared with, much less scrutinized by the jury. As a result, examination of the pretrial order should play no part in the Court's threshold analysis, which must be: does the evidence on the record support the jury's award? If, the evidence does not exist to support the

In *McBro* the Court did analyze the evidence on the record and determined that the plaintiff in that case had incurred a disability of approximately five percent to his knee. *Id.*at 1338. It further found that the plaintiff had incurred costs of $2,242.45 for arthroscopic surgery (*Id.*) and lost wages of $2,074.00. *Id.* at 1339. The Court further found that there had been no evidence of loss of future earnings or loss of future earning capacity. *Id.* at 1338. The rest of the evidence examined by the Court involved unquantifiable damages for loss of enjoyment of life, including testimony by the plaintiff's wife that her husband is no longer able to enjoy dancing and hiking and is unable to help chase their two-year old daughter when she runs off in the grocery store. *Id.* at 1339. Despite this paucity of evidence, the jury in McBro awarded the plaintiff one million dollars in damages and awarded his wife $150,000. *Id.* at 1334. Ultimately, after reviewing the evidence and determining that it supported less than $5,000.00 in monetary damages, this Court did examine "over fifty personal injury cases involving knee injuries to aid it in assessing an appropriate award for the injuries plaintiff suffers." *Id.* at 1339. In other words, when the Court was unable to find evidence in the record for the jury's award, it looked to other cases to determine whether or not the award was excessive. In the end, the Court held that $200,000 for the plaintiff and $25,000 for his wife were the maximum amount supportable by the evidence. *Id.* at 1340.

██ Of course, many courts deciding motions involving remittitur discuss other cases involving similar facts and/or injuries. In most cases (like *McBro*) however, these courts focus primarily on the facts and evidence in the case at bar and examine the results of other cases only as a secondary measure. Almost across the board, the examination of other cases, as in *McBro*, is utilized to determine what a reasonable award should be for "pain and suffering" damages. It may well be appropriate to examine other cases in the context of pain and suffering since an examination of the trial record to determine whether or not the jury's award is supported by the evidence, will be of little utility. Pain and suffering damages

jury's award, then perhaps the pre-trial order is something that the trial judge might examine to determine whether or not the award is excessive.

261

are unquantifiable; no expert, lay witness, document or photograph can assume to fix the amount that should be awarded for human anguish. Perhaps, in such cases, where there is so little evidence of monetary damages, and the Court is left to determine whether pain and suffering damages are excessive, the Court has no recourse but to compare one jury's award with a sampling of other awards in other cases.

 This brings the Court to the special problem presented by the instant case. When the record in this case is examined carefully, it becomes clear that the evidence presented supports the award made by the jury—*even if damages for pain and suffering are assumed to be zero*. Plaintiff presented evidence at trial, evidence which was quite convincing and presented by a credible expert, that Mr. Williams' economic damages alone might be estimated at almost 6 million dollars. (Tr., vol. II at 195-196.) Apparently, this evidence was extremely compelling to the jury. By the standards as this Court understands them, the Court must concede that the jury was justified in making the award that it did. The Court itself would have granted a smaller award based upon the same evidence— although not dramatically smaller—however, the case law is clear that the Court may not remit a large jury award simply because the Court, acting in the place of the jury, would have come to another result. *Maylie v. National R.R. Passenger Corp.* 791 F. Supp. 477, 481 (E.D. Pa. 1992). A review of the trial record makes clear why and how the jury came to the award level it did.

Through their questions and cross-examinations, defendants attempted to suggest that Mr. Williams' is still able to work and earn a living. Defendants presented no expert testimony to support this suggestion, however. Plaintiff himself testified that he had attempted to continue working since the accident in order to provide for his family—but that in August 1994 he finally had to give up his job. (Tr., vol. II at 113-117.) In addition, several expert witnesses testified that the damaged discs and resulting nerve damage suffered by Mr. Williams in the accident has rendered him totally and permanently disabled. Dr. Nelson, an expert in neurology and internal medicine, testified that the plaintiff is permanently and totally disabled and should not work at all. (Tr., vol. I at 156.) Dr. Nelson further testified that there was a 70 percent chance

that plaintiff's injury could be improved through surgery, but also that there was 10 percent chance that surgery would worsen plaintiff's condition and a 20 percent chance that surgery would leave Mr. Williams' condition unchanged, and that it was reasonable for plaintiff to choose not to undergo the surgery. (Tr., vol. I at 155-156.) Dr. Sylvia Payne, an expert in physical medicine and rehabilitation, agreed with Dr. Nelson's assessment that Mr. Williams is totally and permanently incapacitated and added her opinion that his condition is likely to worsen. (Tr., vol. II at 31-32.) She further testified that he should not "lift weights more than 25 pounds. He should avoid standing for more than an hour or sitting for more than an hour or walking for more than an hour." (Tr., vol. II at 31.) Finally, Dr. Chester Copeman, an expert on psychology, vocational rehabilitation and the diagnosis and treatment of chronic pain, testified that plaintiff is "100 percent disabled." (Tr., vol. III at 146.)

Defendants also asked the jury to infer that Mr. Williams' current difficulties were caused by injuries that pre-existed the accident. Again, defendants presented no expert testimony to support this suggestion. Plaintiff's experts, Drs. Payne and Nelson, however, testified that the cause of plaintiff's current problems was the accident with Mr. Rene. (Tr., vol. I at 144, and vol. II at 34.) These experts made this assessment after reviewing the plaintiff's extensive medical records, including reports of previous back injuries and the x-ray report taken a few months prior to the accident.

Probably most critical to the plaintiff's case was the testimony Dr. Bernard Pettingell, plaintiff's expert economist. Dr. Pettingell's testimony was extremely thorough. He testified that a conservative estimate of plaintiff's monetary damages was $920,766. (Tr., vol. II at 165.) Under questioning by plaintiff's counsel, however, Dr. Pettingell proceeded to explain various reasons why this estimate was actually extremely conservative. He stated that Mr. Williams would likely be required to work past age 65 because of the fact that he has young children. (Tr., vol. II at 167-168.) He also stated that he had underestimated Mr. Williams' life expectancy (Tr., vol. II at 169). He further testified that he had underestimated the value of the services Mr. Williams performs around the house and the money Mr. Williams might have made training horses and fixing

cars. (Tr., vol. II at 169-170.) Finally, Dr. Pettingell testified that he had greatly overestimated the amount of income taxes Mr. Williams would have likely been required to pay. (Tr., vol. II at 196-197.) As he recounted each of the ways in which he had conservatively estimated Mr. Williams earning potential, Dr. Pettingell also gave estimates about what the size of the his estimate of future earnings and other monetary damages would have been had he made more generous assumptions. (See, Tr., vol. II at 165-179.)

Another key point in the testimony came when Dr. Pettingell discussed the discount rate he used and how it effected his estimate of Mr. Williams' damages.

> Q Would you take the amount that you calculate that represents the part of the $920,000.00 that is loss of wage earning capacity and put that on the board, please?
> A Yes, ma'am. That figure is exactly $753,557.00.
> Q Okay. And, again, that figure, $750,000.00 to round it off would be a larger amount if we calculated his mechanic work and his horses and his taking care of people's land?
> A Correct.
> Q Now, if the inflation was running at the same rate as interest on money, would the discount rate then be zero and your final figure be the $1,800,000.00?
> A Correct. That has happened in the past but right now we have a differential.
> Q And what you're trying to do is guess now in the future whether or not those two will run hand in hand or not?
> A Right.
> Q And in the past they have run hand in hand but you're taking what's occurring today rather than what might happen in the future?
> A Yes, ma'am.

(Tr., vol. II at 175-176.) Viewed from the perspective of a reasonable juror, this evidence may have allowed the jury to apply a lower discount rate in coming to their conclusion than the 7.1 percent rate used by Dr. Pettingell. (Tr., vol. II at 175.) This is probably especially true given current media reports about impending

264

increases in inflation and changes in the interest rate by the Federal Reserve.

A final exchange between Ms. Rohn and Dr. Pettingell makes it very difficult to hold that the jury's finding is unsupported by the evidence. Dr. Pettingell testified that he had assumed a 5% rate of growth for Mr. Williams' salary. He further stated that this was a conservative estimate because Mr. Williams' salary had actually increased much faster than that in recent years—11.5 percent in 1991, 16.4 percent in 1992, and 21 percent in 1993 (Tr., vol. II at 182-183). On redirect Ms. Rohn had the following exchange with Dr. Pettingell:

> Q And if you took the actual increase of 11.5 percent in 1991 and 16.4 percent in 1992 and the 21 percent in 1993 and you average those and use that as your actual increase rather than the conservative 5 percent, how much larger would that number be?
> A It would be three times higher because it's 16.1 percent on average.
> Q So instead of two million, you would have a number of six million dollars; is that right?
> A Yes, ma'am, or close to it.

(Tr., vol. II at 195-196.)[33] If the jury believed this testimony, then the entire $4.5 million dollar award is actually lower than the evidence revealed in the record of Mr. Williams' maximum economic damages. If they believed this testimony, it is possible that they came up with the $4.5 million dollar award without even consid-

---

[33] The Court believes that Dr. Pettingell's testimony suggesting that Mr. Williams might have continued to increase his salary at a rate of 16.1% was, and is, highly questionable. Unfortunately, defendants never made an objection to any part of Dr. Pettingell's testimony, much less did they object that this particular figure was speculative. In fact, on cross-examination defendants emphasized the recent rapid rate of growth in plaintiff's salary, apparently in an effort to convince the jury that Mr. Williams had not actually been injured. (Tr., vol. II at 182-183.) The jury's verdict—$4.5 million dollars—indicates that the jury may also have found the 16.1% rate excessive. Had the jury applied that rate (and accepted the other higher estimates suggested by plaintiff's economist) they might have awarded the plaintiff $6 million dollars in economic damages before ever considering pain and suffering. The fact that the jury's ultimate award is $4.5 million, suggests that they rejected portions of the testimony of plaintiff's economic expert's testimony despite the fact that it was unrebutted by any expert testimony by the defendant.

ering any damages for pain and suffering. It is quite likely that the jury did believe plaintiff's evidence since it was essentially unrebutted by the defendants. Defendants did not produce their own economic expert and their cross-examination of Dr. Pettingell was ineffectual (See, Tr., vol. II at 179-195). Moreover, defendants never made an objection to any portion of Dr. Pettingell's testimony. Defendants did attempt to show that Mr. Williams might have been eligible for disability payments from his employer, however they in no way established that such payments were certain.[34]

Finally, there was substantial and compelling evidence that Mr. Williams deserved damages for pain and suffering, mental anguish and loss of enjoyment of life. His own testimony, as well as that of the various doctors who testified, suggested that he experiences constant, or near constant, pain. Psychiatrist, Dr. Olaf Hendricks testified that plaintiff "was having suicidal feelings as a result of pain and inability to perform normally." (Tr., vol. II at 205.) Dr. Hendricks prescribed Ativan for Mr. Williams and expressed his opinion at trial that plaintiff had developed a physical and psychological addiction to Tylenol Number Three. (Tr., vol. II at 209.) Dr. Copeman, a Ph.D. in clinical psychology, testified that Mr. Williams' "presented as depressed and suicidal" (Tr., vol. III at 129), and Mr. Williams' girlfriend, Ms. Tutein testified that Mr. Williams' cries "a lot" and has talked about committing suicide (Tr., vol. IV at 8-9.) Finally, testimony from various witnesses, and the plaintiff himself, overwhelmingly suggests that Mr. Williams has experienced a dramatic decrease in his ability to "enjoy life." He is allegedly no longer able to have sexual intercourse without pain, no longer able to ride his horses, no longer able to play baseball or even to lift up his youngest child.

In this case, the law dictates that the Court not disturb the jury's award because it is reasonably based on the evidence presented at trial. The wisdom of this law becomes immediately apparent when the Court considers the alternative. If the Court were permitted to

---

[34]Even if the jury had believed testimony that plaintiff would receive disability benefits, the record reflects that such payments would have amounted to only $12,000 for 17 years (Tr., vol. IV, at 145)—an amount which pales in comparison to the estimated damages presented by the plaintiff.

re-consider the jury's award—even when it is based on evidence presented at trial—the very purpose of a jury, and its role as the trier of fact, would be obscured. The Court would invade the jury's province and substitute its assessment of the evidence for that of the jury. Merely reciting what the Court would do, makes clear that the Court must let the jury verdict stand. The jury's verdict, is based on evidence in the record, evidence which defendants had ample opportunity to rebut, and did not.

Our adversarial system requires that both plaintiff and defendant will do their best to make their case so that the jury has the best information from which to make its decision. When one side or the other does not carry their burden, either through lack of evidence or lack of competence, the resultant jury verdict may appear quite lopsided. Despite this, the Court must not cast the jury aside and insinuate itself into the process as an advocate for the litigant which did not effectively make its case at trial. To do so would be to denigrate the importance of the service provided by jurors and the protections afforded by the Seventh Amendment.

■ The size of the verdict granted by the jury in this case—$4.5 million dollars—is huge by any standard. The Court is confident that had it been acting as the finder of fact in this case, it would not have settled upon such a large amount. Nevertheless, the Court is satisfied that the evidence for such a large award was clearly presented at trial and is reflected in the record. As such, a comparison of the award in this case to awards made (and remitted) in other cases in this jurisdiction is unnecessary. The Court may not reduce the award made by the jury since it is less than the maximum award supported by the evidence.

## X. Conclusion:

For all of these reasons, the Court will deny Defendant's Motion for a New Trial, Judgment as a Matter of Law or in the Alternative, Remittitur.

## ORDER

For the reasons outlined in the attached memorandum opinion of even date, it is hereby

ORDERED that defendant's motion for a New Trial, Judgment as a Matter of Law, or in the Alternative, Remittitur is hereby DENIED.